UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FRANKLIN MONFISTON,

    Plaintiff,

v.                                          Case No.:  2:15-cv-662-FtM-38MRM

HOWARD WETTERER and S.E. PUGH,

    Defendants.
_____/

## **OPINION AND ORDER**[1]

Before the Court is Defendant Howard Wetterer, M.D.'s Motion for Summary Judgment (Doc. 64) and *pro se* Plaintiff Franklin Monfiston's response in opposition (Doc. 66). For the reasons below, the Court grants in part and denies in part the motion.

## BACKGROUND

This case involves a deliberate indifference claim under the Eighth Amendment. Monfiston is a prisoner at the Charlotte Correctional Institute, which is owned and operated by the Florida Department of Corrections. On July 19, 2015,[2] Monfiston fell from a step stool and injured his right arm and wrist. He immediately went to the prison's medical unit. The nurse told Monfiston that his arm "looked fractured." (Doc. 64-2 at 14:14-16). She did not call Dr. Wetterer, the prison's Chief Health Officer, but gave Monfiston 2-3 tablets of Ibuprofen for his pain (which he rated an 8 out of 10), an ice bag,

---

[1] Disclaimer: Documents hyperlinked to CM/ECF are subject to PACER fees. By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide, nor does it have any agreements with them. The Court is also not responsible for a hyperlink's availability and functionality, and a failed hyperlink does not affect this Order.

[2] Unless stated otherwise, all dates occurred in 2015.

and an ACE bandage. (Doc. 64-3). She also gave him a pass to return the next morning. (Doc. 64-3).

At the follow-up appointment, Monfiston saw a nurse practitioner. She ordered an x-ray because the arm looked fractured. (Doc. 64-2 at 16:20-25; Doc. 64-4). She also prescribed Naproxen for the pain. (Doc. 64-2 at 35:22-24).

On July 21—two days after the fall—Monfiston's arm was x-rayed. (Doc. 64-6). The Radiology Report found a "mildly displaced comminuted fracture of the distal radial shaft," soft tissue swelling, a normally articulated wrist and elbow, and "no radiopaque foreign bodies." (Doc. 64-6). Following the x-ray, Dr. Wetterer saw Monfiston for the first time. (Doc. 64-2 at 20:8-10). The parties tell different stories about their interaction.

Monfiston paints a picture of indifference. After finishing the x-ray, Monfiston waited in the hallway for the technician to get Dr. Wetterer. (*Id.* at 18:15-21). The doctor arrived, grabbed Monfiston's medical chart, and went into the x-ray room without a word. (*Id.* at 19:4-12). After Dr. Wetterer left the x-ray room, Monfiston "had to call out to him and ask him what was going on. Dr. Wetterer just told [Monfiston] that it was a simple fracture and that [he] could leave." (Doc. 68 at 2). Monfiston then asked Dr. Wetterer about a splint or sling to immobilize his arm and reduce the pain. (*Id.*). Dr. Wetterer told him "that they did not have materials for a splint and sling." (*Id.*; Doc. 64-2 at 20:1-13). When Monfiston requested more pain medicine because he ran out, Dr. Wetterer told him "to ask the nurse on [his] way out." (Doc. 68 at 2). A nurse then instructed Monfiston to put in a sick-call for Ibuprofens, so he left without any medicine. (*Id.*). Monfiston says Dr. Wetterer never examined his arm to assess the extent of his injury. (*Id.*).

2

Dr. Wetterer provides a narrative of more attentive care. He says that he consulted with Monfiston after he confirmed the fracture. Dr. Wetterer describes the consultation as follows:

> 5. After review of the X-Rays, I determined Mr. Monfiston's arm fracture was of the type where immobilization was necessary but immediate splint and sling was not necessary because the arm was not dislocated.
>
> 6. After determining he had a right arm fracture, I placed an immediate medical hold on Mr. Monfiston to prevent him from having to do physical activities. I also drew up paperwork referring Mr. Monfiston to an orthopedic specialist. The purpose of that referral was to have a specialist examine the nature of the fracture and if necessary, cast or sling the fracture and if necessary, perform surgery. I also made sure that Mr. Monfiston's pain was managed by reviewing medical records and medications being administered to Mr. Monfiston's at that time.
>
> 7. In meeting with Mr. Monfiston, I advised that as long as he kept the arm immobilized and his pain was managed, there was no heightened medical risk or risk of exacerbating his condition by not placing his arm in a sling or cast immediately. In other words, I determined it was medically safe for Mr. Monfiston to wait to see a specialist to be fitted for a sling and soft case.

(Doc. 64-1 at 3-4).

Monfiston's medical records confirm that a request for an orthopedic consultation was made on July 21 and approved the next day. (Doc. 64-7). A few days later, Monfiston signed consent paperwork to see the specialist. (Doc. 64-2 at 22:17-21:3).

On July 27—eight days after the fall—Monfiston met with the orthopedic physician. Before the appointment, Dr. Wetterer told Monfiston that the specialist was putting a cast on his arm and "if he had the materials, he would have done it himself." (Doc. 68 at 3; Doc. 64-2 at 23:14-22). New x-rays were taken, and Monfiston was diagnosed with a

3

"Galeazzi fracture complex with butterfly fragment and a long oblique type fracture of the radius with dislocation of distal radial ulnar joint" that required urgent surgery. (Doc. 64-7; Doc. 64-8). Monfiston says the orthopedic commented, "I bet you are in a lot of pain." (Doc. 68 at 4). The orthopedic gave him a soft cast, which immediately helped. (*Id*).

Monfiston returned to the prison that same day and saw Dr. Wetterer in the lobby. According to Monfiston, "Dr. Wetterer looked surprised that [he] did not have a hard-cast on [his] arm. [He] told him what the doctor had said about the injury and surgery and Dr. Wetterer looked shocked and could not respond to that." (*Id.*). Monfiston also learned the Naproxen had arrived. (*Id.* at 3). He got 28 tablets with no refill. (Doc. 64-5).

On July 29—ten days after the fall—Dr. Wetterer approved the surgery for the next day. (Doc. 64-7). The procedure was successful, but the orthopedic described Monfiston's fracture as "quite complex" and noted the procedure was not without difficulties. (Doc. 64-8). Ultimately, the orthopedic believed Monfiston would see good results. (*Id.*).

During these events, Monfiston filed an internal grievance about his medical care. He complained of "deliberate indifference to [his] medical needs" because he only received an ace bandage for his broken arm. (Doc. 66-7 at 3). The grievance reads,

> I went back to medical where I was seen by the doctor. He also acknowledged that my arm was fractured. However, I have not been taken to a hospital to have my arm reset, I have not gotten x-rays, and I have not received a cast or sling for my arm. It has been two days and the only treatment that I've received from medical for my broken arm has been some pain medication and an ace bandage.

(*Id.*). Dr. Wetterer responded nine days later:

> Your arm has been X-rayed and your fracture is of the type that is immobilized is what is needed since it is not dislocated.

> I am presently waiting to have you brought to me so I can place your arm in a splint as well as the wrapping. You are scheduled for orthopedic consult for casting. As long as you keep your arm stable and not fall again, there is no risk for you until you are seen for a cast.

(*Id.* at 2).

Monfiston's post-surgery care is also at issue. Monfiston returned to prison on the same day of his surgery. A nurse sent him to general population, where he had been reassigned to an upper bunk. (Doc. 68 at 4). A guard tried to help him, but without a lower bunk pass, he could do nothing. (*Id.*). Around midnight, Monfiston's medicine wore off and he "thought [he] might go into shock or die from the pain [he] felt. It felt like someone was slowly sawing into the length of the bone in [his] arm all night. It was too painful to sleep." (*Id*). He went to medical the next morning and got a seven-day lower bunk pass, which Dr. Wetterer later extended thirty days. (Doc. 64-9).

On July 31, Dr. Wetterer requested a follow up evaluation. (Doc. 64-10). At that appointment on August 10, Monfiston got a hard cast and was ordered not to lift or load with the injured limb. (*Id.* at 2).

On or about September 14, the orthopedic removed Monfiston's hard cast. (Doc. 66-3). Because Monfiston's arm had not yet healed, he got a second hard cast for another four to six weeks. (Doc. 68 at 5). Monfiston recalls the orthopedic telling him he would remove the second cast and recommend physical therapy. (*Id.*). Neither happened. (*Id.*).

On October 21, Monfiston filed this civil rights suit under 42 U.S.C. § 1983. He has sued Dr. Wetterer for deliberate indifference to his pain and suffering from the broken

arm and dislocated wrist in violation of the Eighth Amendment. (Doc. 1 at 9).³ His claim includes pre- and post-surgery allegations. Before the surgery, Monfiston challenges Dr. Wetterer not giving him a sling or splint and the six-day delay in seeing the orthopedic. After the surgery, Monfiston takes issue with Dr. Wetterer not giving him pain medicine and a lower-bunk pass. Dr. Wetterer now moves for summary judgment on two grounds: (1) he is entitled to qualified immunity; and (2) his conduct did not amount to deliberate indifference to Monfiston's serious medical needs.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 governs motions for summary judgment. It says the court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008). A fact is material if "it would affect the outcome of the suit under the governing law." *Id.*

In deciding a summary judgment motion, "courts must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party[,] and 'when conflict arise between the facts evidenced by the parties, [courts] credit the nonmoving party's version.'" *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006) (citation omitted). Courts neither weigh the evidence nor determine the truth of the matter. *See Anderson*

---

³ Monfiston also sued the two nurses who saw him right after his fall: Susan E. Pugh and Karen Blankenship. Pugh has never been served, and the Court dismissed the Complaint as against Blankenship with prejudice. (Doc. 34).

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). Upon discovering a genuine dispute of material fact, the court must deny summary judgment.

## DISCUSSION

To establish a claim under § 1983, a plaintiff must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under the color of state law. *Brennan v. Thomas*, 780 F. App'x 813, 820 (11th Cir. 2019). Dr. Wetterer admits that he is a qualified state actor. *Id.* (stating prison physicians' treatment of prisoners is state action under § 1983, even if the state employs the physician directly or by contract). Accordingly, the Court need evaluate only whether Dr. Wetterer violated Monfiston's Eighth Amendment rights.

On this issue, the Court starts with Dr. Wetterer's qualified immunity defense. "Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (internal quotations omitted). Although robust, qualified immunity has limits. It does not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the [plaintiff's] constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (internal quotation marks & alteration omitted).

The Eleventh Circuit uses a burden-shifting approach to address qualified immunity. To invoke the immunity, a defendant must initially show he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred. *Melton*, 841 F.3d at 1221. If successful, the burden then shifts to the plaintiff to prove that qualified

immunity is inappropriate. To do so, the plaintiff must prove two elements: (1) the official's alleged conduct violated a constitutionally protected right; and (2) the right was clearly established at the time of the misconduct. *Id.*

It is beyond contention that Dr. Wetterer acted within the scope of his discretionary authority when he treated Monfiston. The burden thus shifts to Monfiston to overcome qualified immunity. The Court starts with the first element.

1. *Constitutionally protected right*

The Eighth Amendment protects prisoners from "cruel and unusual punishments." U.S. Const. amend. VIII. This language has been interpreted to govern not only punishments in the literal sense, but also the treatment prisoners receive while incarcerated. *Farmer*, 511 U.S. at 832. In this context, the Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a deliberate indifference claim, a prisoner must show (1) a serious medical need; (2) a defendant's deliberate indifference to that need; and (3) causation between that difference and the plaintiff's injury. *Melton*, 841 F.3d at 1220; *see also Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (stating that personal participation in the constitutional violation can show causation).

All parties agree that Monfiston's broken arm and dislocated wrist were serious medical needs. See *Melton*, 841 F.3d at 1222 (finding that the prisoner "had a serious medical need for treatment after he fell, broke his left humorous, dislocated the hardware in his arm, and began to experience severe pain"); *Harris v. Coweta Cty.*, 21 F.3d 388, 394 (11th Cir. 1994) (noting "[a] few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding cuts may constitute deliberate indifference"

(citation omitted)). But the agreement ends there. The parties square off over whether Dr. Wetterer acted with deliberate indifference to Monfiston's injuries by not issuing him a sling, splint, pain medicine, and a lower-bunk pass.

A prisoner "claiming deliberate indifference to a serious medical need must prove (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Melton*, 841 F.3d at 1223. An "official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (internal quotations omitted); *see also Melton*, 841 F.3d at 1223. Put simply, both grossly inadequate care and medical care so cursory as to amount to no treatment at all constitute deliberate indifference. Showing negligence or medical malpractice in the diagnosis or treatment of a prisoner's medical condition, however, does not violate the Eighth Amendment. *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). Nor does "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment" equate to a constitutional violation. *Id.*

As mentioned, the Court must draw all reasonable inferences in Monfiston's favor. Under this standard, the Court finds genuine issues of material fact exist as to whether Dr. Wetterer's pre-surgery conduct constitutes deliberate indifference. Dr. Wetterer did not prescribe Monfiston a sling, splint, or other device to relieve Monfiston's pain while he waited to see the orthopedic. Monfiston and Dr. Wetterer offer different explanations for why this happened. Monfiston says Dr. Wetterer did not have the materials. Dr. Wetterer never refutes (or mentions) Monfiston's claim that he did not have materials to splint or

sling his arm. While Dr. Wetterer rests on his opinion that Monfiston's injury was such that a sling or splint was unnecessary and there were medical risks of using such devices immediately. (Doc. 64-1 at 3, 5). Dr. Wetterer also argues that he referred Monfiston to the orthopedic to determine whether a cast, sling, or surgery was needed. (Doc. 64-1 at 3; Doc. 66-7 at 2). But it is unclear why an orthopedic was needed for such basic treatment when Dr. Wetterer reviewed Monfiston's x-ray. And if Monfiston's injury was so severe that surgery was possible, a jury may not credit Dr. Wetterer's initial opinion that Monfiston did not need a sling or splint. *See* *Melton*, 841 F.3d at 1226 (finding that a doctor acted with deliberate indifference to the prisoner's broken arm and pain where the prisoner used a towel as a make-shift sling for three months because the doctor never offered another device to alleviate his suffering).

The dispute over material facts does not end there. Under Monfiston's version of events, Dr. Wetterer never examined him, assessed his pain levels, or told him about the treatment plan. The July 21 medical notes corroborate Monfiston. (Doc. 64-7). It records no physical examination. Nor does it reflect Dr. Wetterer's alleged consultation with Monfiston. Dr. Wetterer knew Monfiston had a fractured arm because of the x-ray. And he knew that Monfiston was in severe pain. Nevertheless, six days lapsed between the x-ray and Monfiston seeing the orthopedic. Monfiston's only relief during that time was Naproxen—which Dr. Wetterer did not prescribe. The record also lacks any evidence to explain why Monfiston had to wait six days to see the orthopedic.[4] A trier of fact thus

---

[4] A footnote in Dr. Wetterer's motion for summary judgment reads, "Dr. Wetterer asserts that the six-day delay between initial consultation and first orthopedic specialist consultation occurred primarily because of scheduling issues with the orthopedic specialist." (Doc. 64 at 6 n.7). But Dr. Wetterer provides no evidence to support that statement. And his affidavit is silent on the matter. (Doc. 64-1).

could find that Dr. Wetterer took such cursory care to treat Monfiston's injury that it amounted to no treatment at all.

Dr. Wetterer argues that Monfiston has provided no verifying medical evidence that the delay before seeing the orthopedic worsened his injuries. The medical evidence says otherwise. The Radiology Report dated July 21 says Monfiston had a "comminuted fracture of the distal radial shaft" and "[t]he wrist and elbow articulate normally." (Doc. 64-6). But the Operative Report shows a radial shaft fracture "with distal radial ulnar joint dislocation." (Doc. 64-8). On the plain face of these documents, the Court must draw the reasonable inference in Monfiston's favor that his injuries worsened from July 21 to the surgery.

At bottom, a reasonable trier of fact presented with Monfiston's evidence could find that Dr. Wetterer's conduct amounted to deliberate indifference. Monfiston thus satisfies the first element to defeat qualified immunity as to Dr. Wetter's pre-surgery conduct. The Court, however, cannot find the same for Dr. Wetterer's post-surgery care.

As stated, Monfiston challenges the lack of pain medicine after he returned from surgery. But he lost this argument as soon as he had admitted (1) Dr. Wetterer never saw him on July 30 after the surgery (Doc. 64-2 at 28:24-29:1); and (2) he still had Naproxen immediately following surgery (*Id.* at 39:1740:5). Monfiston also admits that the orthopedic never prescribed him pain medicine; yet he wants to hold Dr. Wetterer accountable for not doing the same. (*Id.* at 38:12-20).

Dr. Wetterer's other post-surgery conduct at issue is the lower-bunk pass. Monfiston argues he should have received a lower-bunk pass after returning from surgery that lasted until his cast was removed. The Court disagrees. Monfiston has no evidence

that Dr. Wetterer directed his return to general population in an upper bunk after surgery. He even admitted that security, not medical, assigns bunks. (*Id.* at 29:12-16). What is more, Dr. Wetterer approved Monfiston's initial seven-day lower bunk pass and extended it thirty days. (Doc. 64-9). After the extension, there is no evidence that Monfiston returned to medical to ask for more extensions. (Doc. 66-7 at 6). Although an upper bunk may have inconvenienced Monfiston, not every impediment in prison amounts to an Eighth Amendment violation. See *Estelle*, 429 U.S. at 105 (stating not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment").

Because Monfiston cannot show that Dr. Wetterer's post-surgery conduct amounts to deliberate indifference, the Court grants Dr. Wetterer qualified immunity on those claims. The Court will continue the qualified immunity analysis as to the surviving claims directed at Dr. Wetterer's pre-surgery conduct.

*b. Clearly established right*

A right is "clearly established" for purposes of qualified immunity if a reasonable official would understand that his conduct violates the Constitution. See *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). "The touchstone of the 'clearly established' inquiry is whether the official had 'fair warning' and notice that his conduct violated the constitutional right in question." *Melton*, 841 F.3d at 1221 (citations omitted). "For the law to be 'clearly established,' case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates a federal law." *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000).

There is an obvious-clarity exception to the particularized case law rule. An official's conduct may "so obviously violate[] the constitution that prior case law is unnecessary." *Melton*, 841 F.3d at 1221 (internal quotations omitted). What is more, "[a] broad statement of legal principle announced in case law may be sufficient if it establishes the law with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* (internal quotations omitted).

At the time in question, Dr. Wetterer concedes the Eleventh Circuit had established that a delay in treating serious and painful injuries violates the Eighth Amendment. (Doc. 64 at 14). But he argues these "sweeping propositions of law are not enough" because "there was no clearly established right located in particularized case law in July 2015 that would have placed Dr. Wetterer on notice that the six-day delay from the time of initial diagnosis, consultation and diagnostic testing to the time of casting and seeing a specialist for a fractured arm was actionable as deliberate indifference." (*Id.* at 14-15). The Court disagrees.

The Court finds *Brown v. Huges*, 894 F.2d 1533 (11th Cir. 1990) to control. In that case, the prisoner suffered broken foot bones and six hours passed before a doctor saw him. The prisoner sued, among others, the prison guard who knew of the broken foot but never sent for help. The Eleventh Circuit found the guard had no right to summary judgment and that "an unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference." *Id.* at 1538 (citations omitted).

Dr. Wetterer argues *Brown* is not relevant because Monfiston had no clearly established right to see an orthopedic within six days of his x-ray or receive a splint, sling,

13

or cast. Not so. *Brown* clearly established that a delay in treatment could be deliberate indifference. And drawing all inferences in Monfiston's favor, Dr. Wetterer delayed treating Monfiston, or provided such cursory treatment that it amounted to no treatment at all—both scenarios contradict clearly established law. According to Monfiston, Dr. Wetterer did not prescribe him medication or fasten a device to help with his pain. Nor did Dr. Wetterer physically examine Monfiston or tell him that he was being referred to the outside orthopedic for further treatment. Dr. Wetterer also offers no evidence on why it took six days before Monfiston could see the orthopedic. No reasonable doctor with knowledge of Monfiston's broken arm would have ignored his pain, declined to examine him, and pursued treatment without Monfiston's knowledge.

What is more, Dr. Wetterer's oblivious care does not need case law to tell him his actions violated the Eighth Amendment. *Melton*, 841 F.3d at 1221 (stating the obvious-clarity exception applies "where conduct is so bad that case law is not needed to establish that the conduct cannot be lawful" (citation omitted)). In sum, Dr. Wetterer had fair warning and notice that his conduct violated Monfiston's Eighth Amendment right in question. The Court thus denies Dr. Wetterer's qualified immunity defense on his pre-surgery conduct.[5]

One final point. Monfiston did not identify in the Complaint whether he sued Dr. Wetterer in his official or individual capacity. In denying Dr. Wetterer's motion to dismiss, however, the Court stated it construed the Complaint to raise both claims. (Doc. 43 at 2

---

[5] Dr. Wetterer argues that even if the Court denies him qualified immunity, he still did not commit an Eighth Amendment violation. Because the Court's qualified immunity analysis found that Dr. Wetterer's pre-surgery conduct violated the Eighth Amendment, the Court adopts the same reasoning to deny his argument.

("Because Plaintiff is proceeding *pro se*, the Court liberally construes the Complaint as naming Defendant Dr. Wetterer in both his individual and official capacities."). The Court thus put the parties on notice that both theories of liability applied here. In moving for summary judgment, Dr. Wetterer did so in his individual capacity only. (Doc. 64 at 3 (stating "while during the discovery process the Plaintiff frequently made reference to institutional allegations, this motion is solely concerned with the allegation that Dr. Wetterer was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment"). Because Dr. Wetterer did not move for summary judgment on Monfiston's official capacity claim, it too moves forward to trial.

In conclusion, the Court grants in part and denies in part Dr. Wetterer's motion for summary judgment. The Court grants the motion on Dr. Wetterer's post-surgery conduct but denies it on his pre-surgery conduct.

Accordingly, it is

**ORDERED:**

(1) Defendant Howard Wetterer's Motion for Summary Judgment (Doc. 64) is **GRANTED in part and DENIED in part** consistent with this Opinion and Order.

(2) The Court **REFERS** this matter to the non-assigned United States Magistrate for a settlement conference.

(3) Plaintiff Franklin Monfiston is **DIRECTED** to show cause on or before **April 8, 2020**, as to why the Court should not dismiss Defendant Susan E. Pugh for failure to prosecute and to serve. **Failure to respond will cause the Court to dismiss Pugh without further notice.**

**DONE** and **ORDERED** in Fort Myers, Florida this 25th day of March 2020.

*[Signature]*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:    All Parties of Record
U.S. Magistrate Judge Nicholas P. Mizell